**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **YASSINE BAOUCH, on behalf of himself and all those similarly situated, et al;**<br><br>        **Plaintiffs,**<br><br>    **vs.**<br><br>**WERNER ENTERPRISES, INC., and DRIVERS MANAGEMENT, LLC,**<br><br>        **Defendants.** | **8:12CV408**<br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on several motions. Defendants Werner Enterprises, Inc., and Drivers Management, LLC (collectively "Werner") filed the following motions: Motion to Exclude Expert Testimony, ECF No. 303; Motion to Decertify the Class and Collective Action, ECF No. 314; Motion for Summary Judgment, ECF No. 316; and the Motions to Strike, ECF Nos. 347 and 363. Also before the Court are the following motions filed by Plaintiffs: Motion to Partially Exclude Expert Testimony, ECF No. 311; and the Motion for Summary Judgment, ECF No. 321. For the reasons stated below, Werner's Motion for Summary Judgment, ECF No. 316, will be granted and Plaintiffs' Motion for Summary Judgment, ECF No. 321, will be denied. The remaining motions will be denied as moot.

## BACKGROUND

The following facts are those stated in the Parties' briefs, supported by pinpoint citations to evidence in the record, in compliance with NECivR 56.1[1] and Federal Rule of Civil Procedure 56.

---

[1] *See* NECivR 56.1(b)(1):

1

Werner is a logistics company engaged in hauling and delivering freight throughout the United States. Werner employs thousands of drivers to perform its freight transportation services. This case involves an optional payment plan for its drivers that Werner created pursuant to certain Internal Revenue Service ("IRS") regulations (the "Payment Plan"). The Payment Plan provided payments to drivers, ostensibly for meals and other incidental expenses drivers were expected to incur while traveling (the "Payments"). The primary issue in this case is whether the Payments were reimbursements for expenses, or compensation for work performed.

## I. Operation of the Payment Plan

### A. Eligible Experienced Drivers

Werner's drivers were compensated as either experienced or student drivers. IRS Ltr., ECF No. 317-32, Page ID 21154. Werner implemented its Payment Plan for non-student, experienced drivers in 2004. Participation was limited to eligible drivers employed in positions[2] that required them to travel and spend nights away from home on a regular basis. IRS App. Comm., ECF No. 320-3, Page ID 21674, 21677. The Payment Plan offered non-taxable, mileage-based payments, ostensibly representing reimbursement for meals and other expenses incidental to travel. Werner Educ. Materials, ECF 317-37, Page ID 21442. Eligible experienced drivers elected whether to

---

The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.

[2] Werner's Van; Regional; Team Werner; Flatbed; TCU and some Specialized Services (Dedicated) drivers are eligible to participate in the program. Werner Handbook, ECF No. 317-36, Page ID 21427.

participate in the Payment Plan during their new-hire orientation, but were permitted to change their participation status by opting into, or out of, the Payment Plan on a yearly basis. IRS App. Comm., ECF No. 320-3, Page ID 21674. Experienced drivers already employed in 2004 were given the opportunity to opt in to the Payment Plan at the time it was implemented and were permitted to change their participation status annually.

Eligible drivers that elected to participate in the Payment Plan qualified for Payments when driving and away from home overnight. IRS Ltr., ECF No. 317-32, Page ID 21155-156. Werner used a Home Time Counter program on its AS400 Computer System to track drivers' daily statuses. *Id.* If a driver returned home before 6:00 p.m. or left home after noon on a particular day, the driver would be considered "at home" that day. *Id.* "Drivers returning home after 6:00 p.m. from a trip that started on a day prior to the day in which they return home, and those leaving home before noon on a given day and returning on a subsequent day are considered away from home overnight." *Id.* If a driver was away from home overnight but unavailable for work, he or she was given "at home" status. *Id.*

Werner's experienced drivers were paid at various per-mile rates. Those enrolled in the Payment Plan received one portion of their pay based on the applicable mileage rate, subject to taxes, and the other portion as Payments—a non-taxable sum based on the applicable Payment Plan mileage rate for days spent driving away from home overnight. Werner Educ. Materials, ECF No. 317-37, Page ID 21440-442; *see infra* Table 1. The IRS imposed a special transportation meal and incidental expenses rate ("M&IE rate") that limited the daily amount of non-taxable Payments a driver could

receive.[3] In the event a driver's Payments exceeded the M&IE rate, the excess amount was subject to employment and income taxes. Werner Educ. Materials, ECF No. 317-37, Page ID 21441. Thus, no driver could receive a Payment amount that exceeded the IRS-imposed daily limit, but could receive less than the limit based on the Payment Plan mileage rate and the number of miles driven during a particular day. *Id.*

Because the Payments were not subject to employment and income tax withholding, the Payment Plan's primary effect was to cause participating drivers to receive more money in the form of "take-home pay" in their weekly paychecks. IRS App. Comm., ECF No. 320-3, Page ID 21675-676. To demonstrate how the Payments could increase take-home pay, Werner provided an example of how the Payment Plan would apply to experienced drivers in its educational materials, reproduced in the following Table 1:

<u>**Table 1**[4]**:**</u>

**Example of Driver's Net Pay Per Week under Non-Per Diem and Per Diem Plans**

| Assumptions | Current Plan (non-participants) | Per Diem Plan (Plan participants) |
|---|---|---|
| Taxable compensation rate per mile | 28 cents | 17 cents |
| Per diem rate per mile | <u>-    cents</u> | <u>10 cents</u> |
| | | |
| Total rate per mile | 28 cents | 27 cents |
| | | |
| Days away from home during week (on duty) | 6 | 6 |
| Miles driven during the week | 2,300 | 2,300 |
| **Calculation of Net Pay** | | |
| | | |
| Taxable compensation | $644.00 | $391.00 |
| Health Insurance (single) deduction | ($17.88) | ($17.88) |

---

[3] The special transportation federal M&IE rate was $52 per day in 2009 and $59 per day in 2010. IRS App. Comm., ECF No. 320-3, Page ID 21674; Rev. Proc. 2008-59, 2008-41 I.R.B. 857 (2008); Rev. Proc. 2009-47, 2009-42 I.R.B. 524 (2009).

[4] Werner Educ. Materials, ECF No. 317-37, Page ID 21442.

| | | |
|---|---|---|
| 401(k) retirement savings plan deduction | (\$26.00) | (\$26.00) |
| Taxable Income | \$600.12 | \$347.12 |
| Federal income tax withheld (based on 1 withholding allowance) | 66.63 | 28.68 |
| State Income tax withheld (assume 4%) | 24.00 | 13.88 |
| FICA/Medicare withheld | 47.90 | 28.54 |
| Total tax withheld | \$138.53 | \$71.11 |
| Net pay before non-taxable per diem | \$461.59 | \$276.01 |
| Non-taxable per diem | - | \$230.00 |
| Total net pay (excluding bonuses) | \$461.59 | \$506.01 |

**Increase in net pay per week under per diem plan          \$44.42**
**Increase in annual net pay under per diem plan             \$2,310.07**
**Benefit per mile of per diem                                         1.9 cents**
**Percent increase in net pay                                          10%**

Drivers electing not to participate in the Payment Plan received all their pay, based on various per-mile rates, subject to employment and income tax. To the extent non-participating drivers incurred meal and other incidental expenses while traveling, those expenses could be validated with receipts and deducted on their annual income tax returns. Steele Depo., ECF No. 317-3, Page ID 20072.

Drivers participating in the Payment Plan could only deduct such expenses on their annual tax returns when the expenses exceeded their Payments, which were subject to the daily limit imposed by the federal M&IE rate. Werner Educ. Materials, ECF No. 317-37, Page ID 21441. If an experienced driver was providing services away from home, but not actually driving due to a break down, waiting for a load or pick up, etc., he or she would not receive Payments for that time because the driver was not accumulating miles.[5] IRS App. Comm., ECF No. 320-3, Page ID 21676.

---

[5] The mileage-based Payment Plan did not apply to student drivers. Student drivers received Payments based on a flat daily rate regardless of mileage for days spent away from home overnight. Experienced drivers' Payments were based entirely on mileage during days spent away from home overnight. IRS App. Comm., ECF No. 320-3, Page ID 21675.

Werner asserts that it sought to establish its Payment Plan as a recruitment tool for attracting drivers to the company. Steele Affd., ECF No. 324-2, Page ID 23040. Werner claims it had knowledge of other trucking companies that operated similar plans providing untaxed payments for meals and incidental expenses, and that this encouraged Werner to offer a similar program for its drivers. Wingert Depo., ECF No. 317-2, Page ID 20016. An IRS tax examiner concluded that Werner developed and implemented its Payment Plan to recruit new drivers and retain current drivers. IRS Notice of Proposed Tax Adjustment, ECF No. 320-3, Page ID 21666.

**B. Eligible Student Drivers**

Werner implemented its optional Payment Plan for student drivers in 2003, prior to making it available to eligible experienced drivers. Werner's student drivers apprenticed with trainers and drove under supervision throughout an eight-week program during which they generally were away from home. IRS App. Comm., ECF No. 320-3, Page ID 21674. At the conclusion of their initial two-day orientation, student drivers elected whether to participate in the Payment Plan for the duration of the student program. Because student drivers were regularly away from home throughout the student program, all student drivers were eligible to participate in the Payment Plan. Steele Affd., ECF No. 324-2, Page ID 23037. Upon completion and graduation from the student program, drivers were required to indicate whether they would participate in the Payment Plan as an experienced driver.

Student drivers abided by the same Home Time Tracker program as experienced drivers for purposes of determining whether they were at home or away from home overnight. In contrast to experienced drivers, students were not paid based on miles

6

driven. Rather, they were paid a taxable, flat daily rate that varied throughout the eight-week student program, progressively increasing as phases of the program were successfully completed. Werner Handbook, ECF No. 317-36, Page ID 21426. Student drivers participating in the Payment Plan received a low taxable daily rate and static untaxed Payments for every day they were considered away from home overnight. *Id.* The IRS-imposed M&IE rate on untaxed Payments was also applicable to students.[6] Werner Handbook, ECF No. 317-36, Page ID 21425. Because student drivers' taxable pay and Payments were based on a daily rate rather than on miles driven, they were paid as long as they were available for work; it was not necessary that they actually performed work to receive their daily pay.[7] Werner summarized the student driver Payment Plan in its educational materials with the following table:

### Table 2[8]:

**Phase I: Students (Active Days 1-30)**
- $1.86 taxable plus $41 non-taxable, daily;
- $13 taxable plus $287 non-taxable, weekly

**Phase II: Students (Active Days 31-58)**
- $5.43 taxable plus $41 non-taxable, daily;
- $38 taxable plus $287 non-taxable, weekly

**Phase III: Students (Active Days 59+)**
- $12.57 taxable plus $41 non-taxable, daily;
- $88 taxable plus $287 non-taxable, weekly

---

[6] Werner's Handbook explains to student drivers that the special transportation federal M&IE rate was $41 per day. Werner Handbook, ECF No. 317-36, Page ID 21425.

[7] Students were only allowed to drive with trainers. If a student was available to work, "but we [Werner] [did not] have a trainer for him to go out with . . . we [Werner] pay him while he sits in a motel and waits for that trainer, or sits at our terminal, say, and waits for a trainer." Tisinger Depo., ECF No. 320-1, Page ID 21624.

[8] Werner Educ. Materials, ECF No. 317-37, Page ID 21440.

When student drivers participating in the Payment Plan were considered at home for a given day, they received the same taxable daily rate as non-participating student drivers. Non-participating drivers were paid $46.43/day during Phase I; $50.00/day during Phase II; and $53.57/day during Phase III, all of which was subject to employment and income taxes. Werner Educ. Materials, ECF No. 317-37, Page ID 21432. Like experienced drivers, non-participating student drivers could validate and deduct their meal and incidental expenses on their annual tax returns. Participating student drivers could do the same only to the extent their expenses exceeded their Payments. *Id.* Although drivers were separately and specifically reimbursed for work-related expenses such as tolls and pay scales, this procedure was unnecessary for student drivers because the accompanying training driver paid those expenses. Alicea Depo., ECF No. 317-4, Page ID 20153-154.

Werner used a computer program that automatically calculated student drivers' effective hourly rates on a weekly basis, regardless of participation in the Payment Plan. Tisinger Depo., ECF No. 320-1, Page ID 21616-621. If the program calculated a particular student's hourly rate at less than the requisite minimum wage, supplemental pay was automatically added to match the minimum wage rate. *Id.* Werner's Chief Financial Officer explained that the Payment Plan was suspended for student drivers in or around January, 2013, pursuant to the advice of in-house legal counsel. Steele Depo., ECF No. 317-3, Page ID 20111. There was no indication in the record that the Payment Plan had been reinstated for student drivers.

### C. All Payment Plan Participants

All Payment Plan participants received their untaxed Payments in the same weekly check as their taxable pay, but the two amounts were separated and listed under different headings. *See, e.g.*, Pay Statements, ECF No. 317-35, Page ID 21400. The untaxed Payment amounts were labeled "Per Diem" under the heading "Reimbursement" and the regular taxable amounts were labeled "Regular Pay" under the heading "Gross Earnings." *Id.* Werner placed no restrictions on how drivers spent their Payments and drivers were not required to validate their meal and incidental expenses with receipts. IRS App. Comm., ECF No. 320-3, Page ID 21677; Byrd Depo., ECF No. 317-8, Page ID 20277. Drivers were separately and independently reimbursed for work-related expenses such as tolls, scale tickets, and maintenance. Cortez Depo., ECF No. 317-11, Page ID 20418; Blanker Depo., ECF No. 317-7, Page ID 20259-260. These reimbursable expenses were labeled accordingly and listed individually under the heading "Reimbursements" along with, but independent of, the Payments labeled "Per Diem." Pay Statements, ECF No. 317-35, Page ID 21413. Drivers were required to provide receipts for such work-related expenses before they were reimbursed, and they were reimbursed for the exact amount reflected on the receipts.

Payment Plan participants had lower taxable incomes. Because certain benefits such as Social Security and 401(k) contributions were based on taxable income, those drivers who participated in the Payment Plan could be subject to reduced benefits that correlate with taxable income. Werner Educ. Materials, ECF No. 317-37, Page ID 21432; Steele Depo., ECF No. 317-3, Page ID 20108. Werner included this information in its orientation materials, *see id.*; however, Plaintiffs dispute whether Werner actually

9

provided drivers with the information, and assert that drivers were not adequately advised about the potential reduction in benefits. While both parties acknowledge that benefits based on taxable income were affected by the Payment Plan, Plaintiffs assert the evidence does not establish whether Werner actually or adequately advised drivers of the potential effects.

## II. Accountable Plan

In order to provide the Payments free of employment and income taxes, Werner's Payment Plan had to qualify as an "accountable plan," under IRS Treasury Regulations. *See* Treas. Reg. § 1.62-2(c)(2). The amounts paid by an employer under an accountable plan are excluded from employees' gross income and exempt from the withholding and payment of employment and income taxes. Treas. Reg. § 1.62-2(c)(2). In order to qualify as an accountable plan, Werner's Payment Plan needed to meet the IRS regulations' so-called business connection,[9] substantiation, and return of excess expenses requirements. Treas. Reg. § 1.62-2(c)-(f).

Initially, Werner consulted an accounting firm, KPMG, to assist with compliance with accountable plan regulations and later consulted with another accounting firm,

---

[9] *See* Treas. Reg. § 1.62-2(d)(1) & (d)(3)(i):

[A]n arrangement meets the [business connection requirement] if it provides advances, allowances (including per diem allowances, allowances only for meals and incidental expenses, and mileage allowances), or reimbursements only for business expenses that are allowable as deductions by part VI (section 161 and the following), subchapter B, chapter 1 of the Code, and that are paid or incurred by the employee in connection with the performance of services as an employee of the employer. Treas. Reg. § 1.62-2(d)(1).

If a payor arranges to pay an amount to an employee regardless of whether the employee incurs (or is reasonably expected to incur) business expenses of a type described in paragraph (d)(1) or (d)(2) of this section, the arrangement does not satisfy this paragraph (d) and all amounts paid under the arrangement are treated as paid under a nonaccountable plan. See paragraphs (c)(5) and (h) of this section. Treas. Reg. § 1.62-2(d)(3)(i).

10

Deloitte & Touche.  Wingert Depo., ECF No. 317-2, Page ID 20017. In 2003 and 2004, Werner and Deloitte collected data for the IRS regarding the Payment Plan, and eventually requested a private-letter ruling as to whether Werner's Payment Plan qualified as an accountable plan under the applicable regulations. Steele Aff., ECF No. 324-2, Page ID 23043.

Werner interviewed a sample of drivers and a fleet manager, and also relied on Deloitte's research, in an effort to estimate the expected daily meal and other incidental expenses drivers would incur while traveling away from home overnight. Tax Dept. Memo., ECF No. 317-32, Page ID 21187; Steele Depo., 317-3, Page ID 20091. Werner used this data and Deloitte's research to develop its Payment Plan and to represent to the IRS that Werner had established a legitimate estimate of the meal and incidental expenses drivers were "reasonably expected to incur . . . ." Tax Dept. Memo., ECF No 317-32, Page ID 21158-159 ("the drivers are reimbursed only for meal and incidental expenses which drivers are reasonably expected to incur"); s*ee also* Treas. Reg. § 1.62-2(d)(3)(i). The IRS declined to issue the requested private-letter ruling and, thereafter, Deloitte issued several opinion letters to Werner from 2004 through 2007, opining that the Payment Plan complied with the applicable IRS requirements for accountable plans. *Id.*

In January 2013, Werner received a Notice of Proposed Tax Adjustment from the IRS for tax years 2009 and 2010, because a tax examiner concluded Werner's Payment Plan did not qualify as an accountable plan. The examiner concluded that the Payments made under the Payment Plan should be subject to employment and income taxes. IRS Notice of Proposed Tax Adjustment, ECF No. 320-3, Page ID 21670. It was specifically

11

determined that Werner's Payment Plan did not satisfy the business connection requirement for establishing an accountable plan.[10] *Id.* The tax examiner found that experienced drivers participating in the Payment Plan "receive approximately the same cents per mile as those not on the Payment Plan but the cents per mile amount for those on the Payment Plan is merely broken down into two components; taxable and nontaxable." IRS Notice of Proposed Tax Adjustment, ECF No. 320-3, Page ID 21666. From that finding, the tax examiner concluded the Payment Plan "pays essentially the same gross amount to drivers regardless of whether they incur (or are reasonably likely to incur) travel expenses related to [Werner's] business" and, thus, Werner simply "recharacterized" a portion of drivers' pay as non-taxable payments in an effort to attract drivers and avoid withholding employment taxes. IRS Notice of Proposed Tax Adjustment, ECF 320-3, Page ID 21669; *see* Treas. Reg. § 1.62-2(d)(3)(i).

On appeal, the IRS Appeals Commission decided Werner's Payment Plan satisfied the business connection requirement and qualified as an accountable plan. IRS App. Comm., ECF No. 320-3, Page ID 21688. The IRS Appeals Commission found that Werner did not simply "recharacterize" a portion of drivers' pay, but rather based its Payment Plan on research and data collected to estimate the expenses drivers are reasonably likely to incur when traveling away from home overnight.

The Appeals Commission limited its analysis to whether the Payment Plan met the regulations governing accountable plans and reached its decision independent of whether Werner treated the Payments as compensation for minimum wage purposes

_____

[10] The tax examiner determined that the Payment Plan satisfied the substantiation and return of excess expenses requirements; only the business connection requirement was found unsatisfied. IRS App. Comm., ECF No. 320-3, Page ID 21681.

under state and federal law. *See* IRS App. Comm., ECF No. 320-3, Page ID 21678-688. The only mention of minimum wage in the Appeals Commission's analysis was in the context of the student driver program. IRS App. Comm., ECF No. 320-3, Page ID 21675 ("Appeals is not sure what the importance of the minimum wage is since it is not unusual for trainings in some occupations to not be paid wages at all and we are given no analysis of what a student driver should be paid in wages."). Therefore, Werner satisfied the IRS Appeals Commission that the Payment Plan met all the requirements associated with establishing an accountable plan.

## STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "Summary judgment is not disfavored and is designed for every action." *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th

13

Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The moving party need not produce evidence showing "the absence of a genuine issue of material fact."  *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 325).  Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case."  *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial."  *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial."  *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042).  "[T]here must be more than the mere existence of some alleged factual dispute" between the parties in order to overcome summary judgment.   *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts."  *Wagner*, 788 F.3d at 882 (quoting *Torgerson*, 643 F.3d at 1042).  Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue of

material fact" for trial and summary judgment is appropriate. *Whitney*, 826 F.3d at 1076 (quoting *Grage v. N. States Power Co.-Minn.*, 813 F.3d 1051, 1052 (8th Cir. 2015)).

## DISCUSSION

Plaintiffs contend the Payments made to Werner drivers pursuant to the Payment Plan are genuine reimbursements for expenses, and therefore should not be included in the drivers' "regular rate" under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and applicable Department of Labor ("DOL") regulations, 29 C.F.R. § 778.217. Plaintiffs contend that Werner falls short of the minimum wage requirements of the FLSA because Werner improperly includes the Payments to participating drivers in its minimum wage calculations. ECF No. 353, Page ID 24485. Plaintiffs similarly assert that the Payments are not "wages" as defined by the Nebraska Wage and Hour Act, Neb. Rev. Stat. § 48-1200, *et seq.*, and the Nebraska Wage Payment and Collection Act, Neb. Rev. Stat. § 48-1228, *et seq.* As a result, Plaintiffs claim that Werner failed to provide drivers participating in the Payment Plan the requisite minimum wage under Nebraska law. *Id.* Plaintiffs also raise claims for unjust enrichment, breach of contract, and breach of implied contract for failing to pay Plaintiffs the minimum wage.

## I. Plaintiffs' FLSA Claims

Section 206 of the FLSA requires that every employer engaged in commerce pay a statutorily mandated minimum wage. 29 U.S.C. § 206. An employer violates the FLSA's minimum wage requirement when an employee's "regular rate" drops below the minimum wage. *See* § 206; 29 C.F.R. § 778.217(a). Section 207 defines the regular rate, stating, "[a]s used in this section the 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on

behalf of, the employee." Thus, "[t]here is a statutory presumption 'that remuneration in any form is included in the regular rate calculation.'" *Acton v. City of Columbia, Mo.*, 436 F.3d 969, 976 (8th Cir. 2006) (quoting *Madison v. Res. for Human Dev. Inc.,* 233 F.3d 175, 187 (3d Cir. 2000)). However, § 207(e) excludes some forms of payment from the regular rate calculation. Specific to this case, § 207(e)(2) excludes reimbursements for certain expenses incurred by an employee in furtherance of the employer's interests. The statute provides:

> [P]ayments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause; reasonable payments for traveling expenses, or other expenses, incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer; and other similar payments to an employee which are not made as compensation for his hours of employment . . . .

29 U.S.C. § 207(e)(2). The applicable FLSA regulations provide further guidance as to the types of reimbursements under § 207(e)(2) that are excluded from the "regular rate" calculation. *See* 29 C.F.R. § 778.217. Regarding such reimbursements, the C.F.R. states the following general rule:

> Where an employee incurs expenses on his employer's behalf or where he is required to expend sums solely by reason of action taken for the convenience of his employer, section 7(e)(2) is applicable to reimbursement for such expenses. Payments made by the employer to cover such expenses are not included in the employee's regular rate (if the amount of the reimbursement reasonably approximates the expenses incurred). Such payment is not compensation for services rendered by the employees during any hours worked in the workweek.

29 C.F.R. § 778.217(a). By way of illustration, § 778.217(b)(3) states that transportation and living expenses incurred by an employee who is travelling "over the road" on his employer's business are expenses which primarily benefit the employer and "will not generally be regarded as part of the employee's regular rate."

The regulation makes clear that not all payments for expenses incurred while an employee is away from home are excluded from the employee's regular rate for minimum wage purposes. Section 778.217(d) explains:

> The expenses for which reimbursement is made must in order to merit exclusion from the regular rate under this section, be expenses incurred by the employee on the employer's behalf or for his benefit or convenience. *If the employer reimburses the employee for expenses normally incurred by the employee for his own benefit, he is, of course, increasing the employee's regular rate thereby.* An employee normally incurs expenses in traveling to and from work, buying lunch, paying rent, and the like. If the employer reimburses him for these normal everyday expenses, the payment is not excluded from the regular rate as "reimbursement for expenses." Whether the employer "reimburses" the employee for such expenses or furnishes the facilities (such as free lunches or free housing), the amount paid to the employee (or the reasonable cost to the employer or fair value where facilities are furnished) enters into the regular rate of pay as discussed in § 778.116.

§ 778.217(d) (emphasis added).

Plaintiffs claim the Payments made pursuant to the Payment Plan are reimbursable expenses under 29 U.S.C.A. § 207 and 29 C.F.R. § 778.217(a), and thus excludable from the regular rate calculation for purposes of evaluating Werner's compliance with FLSA minimum wage requirements. The Court must determine whether the Payments are valid reimbursable expenses, or whether the Payments are included in the Plaintiffs' regular rate. In making this determination, the Court notes that it is not bound by the labels used by the parties. Instead, the goal of the Court's analysis "is to pierce the labels that parties affix to the payments and instead look to the realities of the method of payment." *Newman v. Advanced Tech. Innovation Corp.*, 749 F.3d 33, 39 (1st Cir. 2014); *see also* 29 C.F.R. § 778.108 ("The 'regular rate' of pay under the [FLSA] cannot be left to a declaration by the parties as to what is to be treated as the

regular rate for an employee; it must be drawn from what happens under the employment contract") (internal citations omitted).

As noted above, DOL regulations state that per diem payments are not included in the regular rate where "an employee incurs expenses on his employer's behalf or where he is required to expend sums solely by reason of action taken for the convenience of his employer" so long as "the amount of the reimbursement reasonably approximates the expenses incurred." 29 C.F.R. § 778.217(a). Thus, the Court must evaluate whether the Payments made under the Payment Plan were (1) reimbursements for expenses incurred solely for Werner's benefit or convenience, and (2) whether the Payments approximated actual expenses. The Court concludes, as a matter of law, that the Payments were not reimbursements for expenses incurred solely for Werner's benefit, and there is insufficient evidence to show the Payments approximated actual expenses.

### A. Expenses Incurred for Werner's Benefit

The Payments do not represent reimbursements for expenses incurred solely for Werner's benefit, because the Payments were compensation for work performed. As noted above, a "payment by way of reimbursement" under § 778.217(b) is not included within the regular rate; however, "[i]f the employer reimburses the employee for expenses normally incurred by the employee for his own benefit, he is, of course, increasing the employee's regular rate thereby." § 778.217(d). To resolve whether a payment is a reimbursement or compensation included within the regular rate courts look to whether the true purpose of the payment at issue is to compensate employees for their work or to reimburse employees for expenses incurred for

18

purposes of work. *See Acton*, 436 F.3d at 977 ("The plain language of the regulation makes clear that all monies paid as compensation for either a general or specific work-related duty should be included in the regular rate."); *see also Sharp v. CGG Land Inc.*, 840 F.3d 1211, 1216 (10th Cir. 2016) (interpreting 29 U.S.C. § 207(e)(2) as exempting from the regular rate expenses "incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer" but not excluding payments made "as compensation for his hours of employment").

Plaintiffs argue that because the Payments were made to drivers while away from home, the Payments were for the primary benefit of Werner. Werner argues that the Payments were in the form of a wage because the purpose of the Payments was to compensate drivers for work performed. The Court concludes that the Payments were in the nature of a wage. First, the Payments to experienced drivers varied with the amount of work performed. Second, the characteristics of the Payments made to both experienced and student drivers demonstrate that the Payments functioned as a wage rather than a true per diem reimbursement.

### 1. *Variable Nature of Payments*

#### a. DOL Handbook and Interpretive Case Law

Payments to experienced drivers acted as compensation for work performed because the Payments were based on miles driven. The DOL provided additional, explicit guidance on how to determine whether payments that are classified as per diem reimbursements are part of an employee's regular rate. The DOL's Field Operations

19

Handbook[11] states "[i]f the amount of per diem or other subsistence payment is based upon and thus varies with the number of hours worked per day or week, such payments are a part of the regular rate in their entirety." DOL Field Operations Handbook, § 32d05(c) (October 2016). Several courts have used this guidance in concluding that per diem payments that vary with the amount of work performed are part of the regular rate. *See Newman*, 749 F.3d at 37-38 (concluding that a purported per diem payment was part of a regular rate where the payment was based on the number of hours worked); *Gagnon*, 607 F.3d at 1041-42 (concluding that a per diem payment was part of the regular rate because the payment varied by the hours worked); *see also Hanson v. Camin Cargo Control, Inc.*, No. H-13-0027, 2015 WL 1737394, at *13-15 (S.D. Tex. Apr. 16, 2015) (concluding that per diem that varied with the amount of hours worked was part of the regular rate).

In *Gagnon*, the plaintiff, a skilled aircraft painter, was paid an hourly rate of $5.50 per hour, an overtime rate of $20 per hour, and a "per diem" rate of $12.50 per hour. *See Gagnon*, 607 F.3d at 1039. The painter sued his employer, asserting the payment scheme violated the FLSA because it reduced the amount of overtime compensation the painter would have received. *See id.* at 1040. The district court concluded that the "per diem" should have been included in the painter's regular rate of pay for purposes of calculating overtime compensation. *See id.* at 1040–41. The United States Court of Appeals for the Fifth Circuit affirmed, reasoning that because the per diem varied with

---

[11] The parties do not dispute that the Handbook's guidance has persuasive impact on this case. *See Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1041 n.6 (5th Cir.2010) ("Although the Handbook does not bind our analysis, we can and do consider its persuasive effect." (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).

the amount of hours worked, "the per diem payments were part of the regular rate in their entirety." *Id.* at 1041.

Similarly, in *Newman*, two engineers were hired to jobs that required them to work away from their homes. 749 F.3d at 35. Both the engineers' employment agreements listed a set hourly wage, an overtime wage, and a weekly per diem payment that was subject to a daily and weekly cap. *Id.* To receive the per diem payment, each engineer signed a Consultant Per Diem Certification that provided for reimbursement "for any business expenses on a per diem basis" using the relevant Internal Revenue Service Federal Travel Reimbursement rate. *Id.* The first of the engineers was eligible for per diem payments for "each day actually worked" up to seven days. *Id.*  The second engineer was also eligible for per diem, but the per diem was capped at a weekly maximum of five days if each day was "actually worked." *Id.* The per diem payments for each engineer, if calculated by the hour, made up the difference between the regular hourly wage paid, and the promised wage of $60 per hour. *Id.*

Both engineers sued their employer under the FLSA arguing that the per diem operated like an hourly wage and should count as part of the regular rate for purposes of calculating overtime under the FLSA. *Id.* Just as in *Gagnon*, the United States Court of Appeals for the First Circuit looked to the DOL's Field Operations Handbook to determine whether the per diem payments were part of the regular rate. *Id.* at 37 (citing § 32d05(c)). The First Circuit examined the per diem payments and concluded that the per diem payments were based on the number of hours worked, and therefore should be included in the regular rate.

Similar to *Gagnon* and *Newman*, qualified, non-student drivers in this case received per diem payments according to the amount of work performed. There is no material dispute that drivers were paid by the mile, at varying mileage rates. Tisinger Aff. ¶12, ECF No. 92-1, Page ID 1055. If a qualified driver elected to enroll in the per diem program, a portion of the driver's pay was classified as per diem pay, and per diem pay was calculated based on the miles driven using a per diem mileage rate. *See* ECF No. 317-35, Page ID 21413-14. For example, Plaintiff David Faykosh was paid at a rate of 12 cents per mile in per diem pay and taxable pay at rates varying from 13 to 33 cents per mile. During the period for his earning statement dated November 27, 2009, Faykosh received $180.84 in per diem pay and $301.56 in taxable pay when he drove 1,507 miles. ECF No. 317-35, Page ID 21413. However, he received only $28.68 in per diem pay when he drove only 239 miles in a different pay period. ECF No. 317-35, Page ID 21414. Similarly, Plaintiff Lance Edwards was paid at a rate of 12 cents per mile in per diem pay and taxable pay at rates ranging from 12 to 22 cents per mile. ECF No. 317-35, Page ID 21423. On his June 16, 2011, earnings statement, Edwards received $140.16 in per diem pay for 1,168 miles driven. *Id.* However, when Edwards drove 2,438 miles during a different pay period, he received a correspondingly higher per diem payment of $292.56. Ex. 1-JJ, ECF No. 317-35, Page ID 21424.

The undisputed evidence demonstrates that drivers opting to receive Payments under the per diem Payment Plan were paid by the mile. Thus, the amount of per diem each qualified driver received was based on the amount of work that the driver performed.  Just as the payments to the plaintiffs in *Gagnon* and *Newman* varied with the amount of hours worked, Payments to non-student drivers under the per diem

program were "based upon and thus varie[d] with" the amount of work performed. *See* § 32d05(c). Accordingly, under the guidance provided in the DOL Handbook, the Payments to experienced drivers were "a part of the regular rate in their entirety." *Id.*

### b.  Miles Driven v. Hours Worked

Plaintiffs argue that § 32d05(c) and the reasoning in *Gagnon* and *Newman* do not apply to this case because the Handbook and the decisions each refer to "hours worked," whereas the qualified, non-student drivers in this case received Payments based on "miles driven."   Yet there is no indication that the principle stated in § 32d05(c), and applied in *Gagnon* and *Newman*, was meant to be tied solely to payments made in the form of an hourly rate. Courts have considered wages linked to work performed in determining whether such wages should be included in the regular rate. For example, in *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424–25 (1945), workers employed to stack boards were compensated at agreed piece rates per thousand board feet stacked rather than an hourly rate. *Id.* at 421. To determine the regular rate, the Supreme Court translated the wage per thousand feet to an average hourly wage. *Id.* The Court concluded that the employer in *Walling* failed to provide an appropriate overtime wage based on the average hourly wage, in violation of the FLSA. *Id.* Thus, the Supreme Court was able to make a determination of the regular rate even though the plaintiffs were paid at a non-hourly wage.

The language of § 32d05(c) demonstrates that to qualify as a true per diem payment, excludable from the regular rate, a payment must be based on days worked rather than some other measuring unit such as hours or miles. The full text of § 32d05(c) states:

> If the amount of per diem or other subsistence payment is based upon and thus varies with the number of hours worked per day or week, such payments are a part of the regular rate in their entirety. However, this does not preclude an employer from making proportionate payments for that part of a day that the employee is required to be away from home on the employer's business. For example, if an employee returns to his/her home or employer's place of business at noon, the payment of only one-half the established per diem rate for that particular day would not thereby be considered as payment for hours worked and could thus be excluded from the regular rate.

The court in *Newman* recognized that the language of § 32d05(c) creates some tension because it permits an employer to reduce a per diem payment where an employee worked a half day, but states that per diem is part of the regular rate if it varies with the hours worked in a week or day. 749 F.3d at 37-38. The court resolved this tension by concluding that "the Handbook's teaching is that the *method* of calculating the per diem . . . must use a day as its measuring unit, and not an hour." *Id.* at 38. The First Circuit determined that the per diem payments in *Newman* were wages because reductions in per diem received were based on hours worked, rather than days worked. *Id.* at 39. "Although the Handbook provision allows a discount in the per diem for partial days, it does not permit an employer to set this discount as a reduction of a fixed amount for each missing hour in the weekly total." *Id.* at 39-40.

In this case, Payments to participating, non-student drivers were based on miles driven, not on days worked or days away from home. Participating drivers were working when they were driving and the Payments they received varied according to the amount of work they performed. There is no reason to conclude that per diem payments measured by the hour would be included in the regular rate under § 32d05(c), while per diem payments measured by some other method smaller than half a day would not. In both cases, per diem payments were measured by units smaller than half a day. As

stated in *Newman*, a reduction in per diem payment by such measurements "runs afoul of the Handbook's guidance." 749 F.3d at 38. The Court concludes that the Payments in this case fall within the language of § 32d05(c) even though the Payments are based on miles driven rather than hours worked.[12]

The undisputed evidence also shows that the drivers' wages, and consequently the Payments received, actually varied according to the number of hours worked. Using an example from above, the record shows that Plaintiff Lance Edwards earned $269.64 in per diem pay during the week of October 23, 2012, through October 29, 2012, when he was on duty 64.25 hours and drove 2,247 miles. Edwards Pay Data, ECF No. 366-5, Page ID 24713-14; Edwards' Driver Log Data, ECF No. 366-6, Page ID 24715-21. The next week, Edwards was on duty 32.25 hours and drove 1,295 miles. *Id.* Edwards earned less per diem pay ($155.40) that week. *Id.* Similarly, Plaintiff Joseph Horton earned $92.52 in per diem pay during the week of July 10, 2012, through July 16, 2012, when he was on duty a total of 30.25 hours and drove 771 miles. Horton's Pay Data, ECF No. 366-7, Page ID 24722; Horton's Driver Log Data, ECF No. 366-8, Page ID 24724-31. The next week, Horton worked more hours (61.75 hours), drove more miles (1,878 miles), and consequently earned more per diem pay ($225.36 in per diem pay). *Id.* The following week, Horton worked only 44.5 hours, thus he drove fewer miles (1,704 miles) and therefore earned less per diem pay ($204.48). *Id.*

---

[12] Plaintiffs also claim that the Payments did not vary with the amount of hours worked because the daily per diem Payments were capped at $52.00 per day. As noted above, per diem payments to the engineers in *Newman* were also capped at a specific amount.  *See* 749 F.3d at 35. As in *Newman*, the cap in this case does not preclude the Court from examining whether the Payments were made as an hourly wage or as a true reimbursement for expenses.

The undisputed evidence shows that participating, non-student drivers' Payments varied with the amount of work performed. The amount of Payments to non-student drivers was determined solely by the amount of miles driven.  Accordingly, the amount of the Payment was based on work performed, and varied in correlation with the amount of hours worked.  Accordingly, the Payments should be included in their entirety as part of the drivers' regular rate.  *See* § 32d05(c).

### 2.  Disparity Between Wages and Per Diem Payments

Several other characteristics of the Payments suggest they were intended to compensate employees for work performed rather than act as a true reimbursement. First, the total pay—Payments plus applicable taxable wage—to both participating non-student drivers and to student drivers was "suspiciously close" to the total taxable wage paid to non-participants. *See Gagnon*, 607 F.3d at 1041. In *Gagnon*, in addition to holding that the per diem payment varied with the amount of work performed, the Fifth Circuit found it "difficult to believe that a skilled craftsman would accept a wage so close to the minimum wage when the prevailing wage for similarly skilled craftsmen was approximately three times the minimum wage."  *Id.* The court was also "troubled by the fact that the combined 'straight time' and 'per diem' hourly rates approximately match the prevailing wage for aircraft painters." *Id.*

In this case, both the experienced and student drivers electing to participate in the Payment Plan received artificially low wages, and when the Payments were factored in, their net pay was identical to or close to that of other employees who opted out of the Payment Plan. For example, in its educational materials given to new drivers, and as shown in Table 1 above, a driver who did not participate in the Payment Plan, and who

earned 28 cents per mile over 2,300 miles would earn $461.59 in net pay. Werner Educ. Materials, ECF No. 317-37, Page ID 21442. The entire 28 cents per mile took the form of taxable wages. Had the same driver elected to participate in the Payment Plan, the driver would be paid at a taxable rate of 17 cents per mile, but would receive a non-taxable per diem Payment of 10 cents per mile. Thus, the participating driver's total rate per mile would be 27 cents, nearly identical to the rate per mile of the non-participating driver. As a result, the participating driver's per diem Payments, the driver's total net pay over the same period would be $506.01.

For student drivers, the result would be similar. Student drivers were provided with the following example of the impact per diem enrollment would have on their total pay:

| Per diem pay examples: | St Driver Pay for Active Days 1-30 | | | Co-Driver Pay Per Day | | |
|---|---|---|---|---|---|---|
| | Without Per Diem | With Per Diem | Increase With Per Diem | Without Per Diem | With Per Diem | Increase With Per Diem |
| Gross pay per day | $46.43 | $1.86 | ($44.57) | $57.14 | $12.57 | ($44.57) |
| Per diem pay per day | $0.00 | $41.00 | $41.00 | $0.00 | $41.00 | $41.00 |
| Total pay per day | $46.43 | $42.86 | ($3.57) | $57.14 | $53.57 | ($3.57) |
| Soc sec tax (FICA) | ($3.55) | ($0.14) | $3.41 | ($4.37) | ($0.96) | $3.41 |
| Fed/st inc tax (@15%) | ($6.96) | ($0.28) | $6.68 | ($8.57) | ($1.89) | $6.68 |
| Net pay per day | $35.92 | $42.44 | $6.52 | $44.20 | $50.72 | $6.52 |
| Net pay per week | $251.44 | $297.08 | $45.64 | $309.40 | $355.04 | $45.64 |

Werner Educ. Materials, ECF No. 317-37, Page ID 21431. Although the taxable wages that participating students received was far lower than those received by non-participating students, participating students' total gross pay, including the Payments, was similar to other qualified student drivers.

This table also illustrates the disparity between the taxable wages of non-participating students and students who participated in the Payment Plan. Similar to the painter in *Gagnon*, it is difficult to believe that a participating student would accept a daily taxable wage of $1.86 while a similarly qualified student's rate would be more than 20 times larger. The disparity in taxable wages between non-participating and participating drivers and student drivers demonstrates that the Payments were intended to be compensation for services rather than a true reimbursement of expenses. For these reasons, these factors suggest the Payments were principally a wage intended to benefit the employees.

### 3. Form and Purpose of Payment

The form and purpose of the Payments also suggest they were intended to act as remuneration for work performed, rather than as reimbursement for expenses. In *B & D Contracting v. Pearley*, 548 F.3d 338, 343 (5th Cir. 2008), the Fifth Circuit addressed whether per diem payments to a ship worker played the role of wages under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 902(13).[13]

-------------------

[13] The Fifth Circuit expressly noted that the definition of wages under the FLSA is different from the definition of wages under the LHWCA. *B & D Contracting*, 548 F.3d at 343. In *B & D Contracting*, the employer argued a non-taxable per diem fell outside the definition of wages under the LHWCA. The Fifth Circuit interpreted the LHWCA's definition of wages as the "money rate at which the employee is compensated plus any taxable advantages." *Id.* at 341 (internal quotation marks omitted). In addition the court examined the per diem's characteristics and concluded that the payments "played the role of wage." *Id.* at 342-43. The employer argued that this is inconsistent with the court's previous determination that a per diem was not a wage under the FLSA. Id. (citing *Berry v. Excel Group, Inc.,* 288 F.3d 252 (5th Cir. 2002)). The Fifth Circuit noted that the definition of wages under the FLSA was different than the definition of wages under the LHWCA, but also specifically stated that the per diem payments in Berry were "legitimate, reasonable reimbursements for travel expenses." *Id.* (citing *Berry*, 288 F.3d at 254).

The Court reads the Fifth Circuit's opinion in *B & D Contracting* as recognizing that the definition of wages under the LHWCA explicitly includes non-taxable payments to be part of an employee's wages, while the FLSA does not. However, although the two statutes are different, the analysis of whether a per diem functions as a wage is the same under either statute. That is, even though the definitions differ, there is no logical reason that characteristics of a wage under the LHWCA, exclusive of express statutory

The court determined that a per diem payment "played the role of wages" because the payments:

> were calculated based on the number of hours worked; they were paid in the same paycheck as the employee's normal wages; the per diem was an unrestricted payment, unrelated to actual costs of meals, lodging, or travel; the same per diem was paid to all employees regardless of where they live; and the per diem constituted almost half of [the employee's] gross pay.

*B & D Contracting*, 548 F.3d at 343.

Each of these characteristics are present for the Payments in this case. As noted above, Payments for all drivers other than students and co-drivers were based on the number of miles driven and consequently correlated with the number of hours worked. Also, drivers received non-taxable per diem pay and taxable wages in the same paycheck. *See, e.g.*, Faykosh Statement of Earnings, ECF No. 317-35, Page ID 21413; *see also, e.g.*, Kinnison Depo., ECF No. 317-21, Page ID 20750.

For participating drivers and students, the Payments constituted a significant portion of their total paycheck. *See B & D Contracting*, 548 F.3d at 343 (concluding that per diem acted as wages where the per diem payment constituted nearly half of the employee's gross pay). For example, Named Plaintiff David Faykosh received $180.84 in per diem pay and $301.56 in taxable mileage pay in one paycheck. Faykosh Statement of Earnings, ECF No. 317-35, Page ID 21413. Thus, for that week, his per diem pay represented almost 40 percent of his total pay. *Id*. This result was even more pronounced for students. Participating student drivers were paid at flat daily rates that varied during the class period, a portion of which was labeled as per diem pay.

---

characteristics, would not also qualify as "compensation for . . . hours of employment" under 29 U.S.C. § 207(e).

*See, e.g.*, ECF No. 317-37, Page ID 21440. For example, during a period when student drivers were paid $46.43 per day ($325/week) the per diem portion of their pay could amount to $287.00—or 88 percent—of a student driver's total weekly pay. *See, e.g.*, Excerpts of Pay Statements, Student Driver Statements of Earnings for Scott Larrow, ECF No. 317-35, Page ID 21400-05. During a period when student drivers were paid $53.57/day ($375/week), the per diem portion of their pay could amount to $336—89 percent—of their total pay. *See, e.g.*, Excerpts of Pay Statements, Student Driver Statements of Earnings for Yassine Baouch, ECF No. 317-35, Page ID 21406-12. That per diem Payments made up such a substantial portion of total pay suggests the Payments acted as compensation rather than a true reimbursement. This is especially evident considering that other similarly qualified drivers could simply choose not to receive the per diem Payments and receive roughly equal pay in the form of taxable wages.

Like the payments in *B & D Contracting*, the Payments to participating drivers were unrestricted. In *Gonzales Elec. Sys. v. Dir., Office of Workers' Comp. Programs*, 496 F. App'x 378, 383 (5th Cir. 2012), the court concluded that per diem payments were more in the form of wages because, in part, employees could spend the payments in any manner and were not required to report expenses. Similarly, here, there were no restrictions on how drivers spent their per diem Payments. When drivers incurred expenses of less than the amount of the weekly per diem payments, they were free to retain the excess for any purpose. *See, e.g.*, Byrd Depo. 23:11-14, ECF No. 317-8, Page ID 20277; Conner Depo. 24:18-23, ECF No. 317-10, Page ID 20386; Blanker

Depo. 12:21- 24, ECF No. 317-7, Page ID 20256. The unrestricted nature of the per diem Payments suggests they acted as compensation rather than reimbursement.

Finally, because Werner introduced the per diem Payments as a means to attract new employees, they more likely acted as wages. In *B & D Contracting*, the court noted that the "per diem payments were designed to maximize employees' take home pay, provide tax benefits to the employer, and keep up with B&D's competitors that paid employees in a similar manner." 548 F.3d at 342-43. Similarly, in *Gonzales*, the employer testified that the per diem payments were intended, at least in part, to make the job more attractive to potential employees." 496 F. App'x at 383. In both cases, the fact that the per diem payments were intended to be used as a recruitment tool suggested the payments acted as wages. *B & D Contracting*, 548 F.3d at 343; *Gonzales*, 496 F. App'x at 383.

In this case, Werner originally developed the per diem program as an incentive to attract potential employees. Tisinger Aff. ¶ 4, ECF No. 92-1, Page ID 1053. At least one Werner official testified that Werner originally began exploring the option of developing a per diem program for its drivers to keep pace with the industry, because other trucking companies had similar programs and drivers frequently asked during recruitment whether Werner had a per diem program. Wingert Depo. 20:18-21:21, ECF No. 317-2, Page ID 20016. Werner's purpose was for its drivers to receive more take home pay by reclassifying a portion of the drivers' existing pay as a non-taxable per diem payment so drivers would have fewer employment taxes and income taxes taken out of each paycheck. Wingert Depo. 28:20-30:16, ECF No. 317-2, Page ID 20018-19. Moreover, Werner advised drivers that enrollment in the per diem program would increase their

take home pay. Company Drivers Per Diem Pay Program Handouts, ECF No. 317-37, Page ID 21444; Student Driver Per Diem Handout, ECF No. 317-37, Page ID 21431. Because the evidence establishes that Werner implemented the per diem program as a means of recruiting drivers, this factor also weighs in favor of concluding the per diem payment is a wage.

### 4.  Benefit of Employer

Payments to participating, non-student drivers varied with the amount of work the driver performed. The Payments to both drivers and students have the characteristics of a wage. The undisputed evidence demonstrates that the per diem Payments under the Payment Plan were in the form of a wage, made "as compensation for . . . employment." 29 U.S.C. § 207(e). The Payments are compensation as a matter of law, and not expenses "incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer." § 207(e)(2). Accordingly, the Payments are included within the regular rate calculation.

### B.  Reasonable Approximation of Actual Expenses

Plaintiffs argue that the per diem Payments constitute valid reimbursements under 29 C.F.R. § 778.217(b), and therefore should not be included within the regular rate under 29 U.S.C. § 207(e)(2). To support this assertion, in addition to showing that the Payments are for the primary benefit of Werner, the evidence must show "the amount of the reimbursement reasonably approximates the expenses incurred." § 778.217(a). The regulations also state that "only the actual or reasonably approximate amount of the expense is excludable from the regular rate. If the amount paid as

32

'reimbursement' is disproportionately large, the excess amount will be included in the regular rate." 29 C.F.R. § 778.217(c).

Plaintiffs encounter a significant hurdle because the statute and its implementing regulations do not appear to permit proof of reasonable reimbursement on a group basis. The regulations applicable to Plaintiffs' claimed exemption use the singular term "employee." *See* 29 C.F.R. § 778.217(b), (d). The FLSA defines the term "employee" as "an *individual* employed by an employer." 29 U.S.C. § 203(e)(1) (emphasis added). The Eastern District of Texas explained:

> The court believes that a fair reading of the language in [§ 778.217(d)] and the FLSA in general demonstrates that it is proper to determine per diem payments in terms of individual employees. By this the court means that employers may choose to set an amount that they deem to be a reasonable per diem for a group of workers, but they do so at risk of violating the FLSA. This is because any amount set aside as per diem *must reasonably approximate the actual amount of expenses incurred by each individual employee*. If the per diem meets this test as to each employee, that amount properly can be excluded from each employee's regular rate of pay. In other words, the court will measure the reasonableness of the employer's per diem policy on an employee by employee basis to see if the amount paid reasonably approximates each individual employee's excludable expenses.

*Picton v. Excel Grp., Inc.*, 192 F. Supp. 2d 706, 712 (E.D. Tex. 2001) (emphasis added).

Plaintiffs must overcome this statutory language by demonstrating that the Payments to the class of over 52,000 Plaintiff-drivers "reasonably approximates the expenses incurred." *See* § 778.217(a).   Plaintiffs attempt to do this in two principal ways. First, Plaintiffs argue that the depositions of a sample of Plaintiff-drivers demonstrate that the per diem Payments were reasonable on a class-wide basis. Second, and primarily, the Plaintiffs argue that Werner is judicially estopped from asserting that the Payments were not reasonable reimbursements because Werner previously represented that Payments were a reasonable approximation. The Court

concludes that neither of these arguments satisfies the statutory and regulatory language, and Plaintiffs have not shown that the Payments reasonably approximated each individual Plaintiff-driver's excludable expenses.

### 1. Representative Depositions

In support of their argument that the drivers incurred meal and incidental expenses and the per diem Payments approximated the amounts incurred, Plaintiffs cite the testimony of 16 Plaintiff-drivers who each testified they incurred expenses ranging from $50 per day to $70 per day. As an initial matter, this representative portion of the class—16 out of 52,000 or roughly 0.0003 percent—is too small a statistical sampling to prove the expenses incurred by each individual driver. *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774 (7th Cir. 2013) (testimony from 42 representative members of a proposed class of 2,341 technicians was an insufficient basis for drawing class-wide conclusions); *id.* at 775 (7th Cir. 2013) ("[The] experience of a small, unrepresentative sample of ['thousands of workers'] cannot support a just and reasonable inference" concerning all class members); *Reich v. S. Md. Hosp.*, 43 F.3d 949, 952 (4th Cir. 1995) (vacating an award of liquidated damages because testimony from only 1.6 percent of the employee population, or 54 of 3,368 employees, did not fairly represent the employee population and noting "1.6% sample constitutes the lowest percentage by far in any reported case using representative testimony"); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977) ("Considerations such as small sample size may, of course, detract from the value of such evidence . . . .").

In addition to the small sample size, Werner presented evidence from a similar number of class members that spent $12 to $22 less per day on expenses than the Plaintiff-drivers cited by Plaintiffs. In either case, the deposition testimony cited is insufficient to establish that the amount of the Payments approximated expenses actually incurred by Plaintiffs.

### 2. Judicial Estoppel

Because Plaintiffs lack direct evidence that the Payments approximated expenses actually incurred, Plaintiffs assert that Werner is estopped from arguing the Payments were not reasonable or did not approximate actual expenses. Plaintiffs rely primarily on Werner's representations to the IRS. In its request for a private-letter ruling and its appeal, Werner represented to the IRS that its Payment Plan was based on expenses it reasonably expected drivers to incur while away from home overnight. Plaintiffs contend that this representation conclusively establishes that the Payments must be excluded from drivers' regular rate under the doctrine of judicial estoppel. The Court concludes, however, that Werner's position in this case is not clearly inconsistent with the position it took before the IRS and its representations to the IRS do not require the exclusion of the Payments from the drivers' regular rate.

"The doctrine of judicial estoppel prevents a party from taking a position during litigation which is contrary to one taken in a prior judicial or quasi-judicial proceeding." *Amtrust Inc. v. Larson*, 388 F.3d 594, 600 (8th Cir. 2004). "The underlying purpose is to protect the integrity of the judicial process." *Bendet v. Sandoz Pharm. Corp.*, 308 F.3d 907, 910 (8th Cir. 2002) (citing *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)). The Supreme Court has recognized that the application of judicial estoppel is

not "reducible to any general formulation of principle." *New Hampshire*, 532 U.S. at 750. There are, however, factors that guide a court's decision to apply judicial estoppel: (1) whether a party's position is clearly inconsistent with its prior position, (2) whether the party against whom estoppel is asserted succeeded in persuading a court to accept its earlier position, and (3) whether the party asserting an inconsistent position gains an unfair advantage or imposes an unfair detriment upon the opposing party if not estopped. *Id.* at 751. The foregoing factors are not "inflexible prerequisites" or exhaustive considerations; "additional considerations may inform the doctrine's application in specific factual circumstances." *Id.*

In order to satisfy the IRS that it had met all aspects of the accountable plan requirements—specifically, the business connection requirement—Werner represented to the IRS that the Payments would be based on prospective estimates of the expenses that drivers were reasonably expected to incur while away from home overnight. ECF No. 317-32, Page ID 21158-59; 21203. Werner based its estimates of expected business expenses by interviewing three of its drivers and one of its fleet managers. Tax Memo., ECF No. 317-32, Page ID 21187. Werner took this position ostensibly because the Payment Plain would only qualify as an accountable plan if the employee incurred "or [was] reasonably expected to incur" business expenses. *See* Treas. Reg. § 1.62-2(d)(3)(i). Thus, Werner chose to attempt to prove prospectively that its employees participating in the Payment Plan were reasonably expected to incur qualifying business expenses.

Werner's position before the IRS is not inconsistent with the position it takes in this case. As noted above, § 778.217(a) of the DOL regulations provides that certain

36

payments made by the employer to cover reimbursable expenses "are not included in the employee's regular rate (if the amount of the reimbursement reasonably approximates the expenses *incurred*)." 29 C.F.R. § 778.217(a) (emphasis added). Plaintiffs assert that Werner's representations to the IRS regarding the business connection requirement[14] satisfy the final, parenthetical clause of § 778.217(a), thus establishing that the Payments made pursuant to the Payment Plan should not be included in drivers' regular rate. *See, e.g.*, Pl.'s Br. in Opp. to Def.'s Mot. Summ. J., ECF No. 353, Page ID 24505. However, the IRS regulations governing accountable plans are not identical to the DOL regulations governing employees' regular rates for minimum wage purposes. To approve an accountable plan, the IRS required that the Payments represent an amount paid to an employee for expenses he or she was "reasonably expected to incur." Treas. Reg. § 1.62-2(d)(3)(i). In contrast, 29 C.F.R. § 778.217(a) requires the Court to determine, in part, whether the Payments approximated expenses the employees actually incurred. Werner did not represent to the IRS that its Payment Plan approximated the expenses individual drivers actually incurred. Rather, Werner's Payment Plan provided a prospective estimate of expenses that Werner expected drivers were reasonably likely to incur. Because Werner made a prospective representation to the IRS, it cannot be said that its position now—that there

---

[14] Plaintiffs allude to several representations made by Werner that the Payments represented expenses employees were reasonably likely to incur.  *See, e.g.*, Defendants' Response to Requests for Admission, ECF 322-2, Page ID 21698; Tisinger Dep., ECF No. 322-5, Page ID 21756. However, each of these representations is identical to the representations made to the IRS and merely a restatement of Werner's argument before the IRS. Moreover, with respect to the Request for Admissions, Werner specifically denied Plaintiffs' request to admit that the Payments represented expenses actually incurred, and stated that the non-taxable portion merely approximated the expenses that Werner expected an employee to incur. ECF No. 322-2, Page ID 21698.

is insufficient proof that the Payments approximated incurred expenses—is clearly inconsistent with its prior position.

It is also apparent that the quantum of proof Werner provided to the IRS falls far short of the proof required in this case. Werner's estimate to the IRS consisted of some research and an interview of three of its drivers and one of its fleet managers. Tax Memo., ECF No. 317-32, Page ID 21187. The Court is not aware of the quantum of proof required to establish an accountable plan before the IRS; however, the unsworn estimates of three employees and a manager fall far short of proving that the Payments reasonably reflect the expenses incurred by a class of 52,000 Plaintiff-drivers under the FLSA.

Werner's rough estimate of prospective expenses submitted to the IRS does not establish retrospective actual expenses incurred for purposes of § 778.217(a). As a result, judicial estoppel does not apply to Werner's representations in this case, and Werner's previous statements do not prove that the Payments were reasonable approximations of expenses actually incurred.

### C.  The Payments Are Part of Plaintiffs' Regular Rate

The Court has reviewed the voluminous evidentiary record and concludes that the Payments must be included under the regular rate for purposes of Plaintiffs' FLSA claims. The undisputed evidence demonstrates that the Payments play the part of a wage. Therefore, the Payments are remuneration for work performed and are for the benefit of the employees under 29 U.S.C. § 207(e). Also, the evidence falls far short of establishing that the Payments approximated the actual expenses incurred by each

38

individual employee. Accordingly, Plaintiffs have not shown that Werner failed to pay a minimum wage under the FLSA.

## II. State Law Claims

Similar to the FLSA, the Nebraska Wage & Hour Act ("NWHA"), Neb. Rev. Stat. § 48-1203 (Reissue 2010), requires that each employee entitled to its benefits receive "wages" which are at least at the statutory minimum wage level (the NWHA does not use the term "regular rate"). Under the law, "[w]ages shall mean all remuneration for personal services, including commissions and bonuses and the cash value of all remunerations in any medium other than cash." Neb. Rev. Stat. § 48-1202(5). Thus, an individual who does not receive as compensation for services rendered at least the minimum wage is harmed under the statute.

Plaintiffs also assert a claim under the Nebraska Wage Payment and Collection Act ("NWPCA"), Neb. Rev. Stat. § 48–1231(1) (Reissue 2010). The NWPCA provides a cause of action for employees to recover unpaid wages. *Id.* "Wages" under the NWPCA are defined as "compensation for labor or services rendered by an employee . . . when previously agreed to and conditions stipulated have been met." Neb.Rev.Stat. § 48–1229(6). In other words, the NWCPA permits an employee to recover wages an employer previously agreed to pay. *See Eikmeier v. City of Omaha,* 783 N.W.2d 795, 798 (Neb. 2010). In this case, Plaintiffs argue that Werner previously agreed to pay all class members consistent with the NWHA. Werner disputes this assertion. However, regardless of whether Werner expressly agreed to pay Plaintiffs in compliance with the NWHA, Plaintiffs' success on their NWCPA claim is contingent upon their success on their claim under the NWHA.

For the reasons Plaintiffs' FLSA claims must be dismissed, Plaintiffs' state law claims also must be dismissed. First, this Court has found "sufficient evidence from the language, purpose, and legislative history of the Nebraska statute to conclude that the NWHA was intended to have substantially the same coverage as the FLSA." *Petrone v. Werner Enterprises, Inc.*, No. 8:12CV307, 2013 WL 3479280, at *4 (D. Neb. July 10, 2013). Thus, to the extent Plaintiffs attempt to premise their success under the NWHA on their claims under the FLSA, their claims must be dismissed for the reasons discussed above. Although the language defining wages under the FLSA and NWHA are slightly different, nothing in the Nebraska statute suggests that the Payments at issue would be classified as wages under the FLSA definition but not under the NWHA definition.

State court precedent also suggests that Nebraska courts would hold that the Payments were more in the form of wages than actual reimbursements. In *Logan v. Rocky Mountain Rental*, 524 N.W.2d 816, 819 (Neb. Ct. App. 1994), the Nebraska Court of Appeals addressed whether a non-taxable per diem payment of $44 per day paid to a truck driver should be counted as a wage for purposes of computing his worker's compensation benefits.[15] The Nebraska Court of Appeals noted that "for tax purposes, trucking companies are allowed to pay a per diem of [$44] per day to the

---

[15] The definition of wages under Nebraska's workers compensation laws is nearly identical to the definition of wages under the NWHA. Nebraska workers compensation law states: "[w]herever in the Nebraska Workers' Compensation Act the term wages is used, it shall be construed to mean the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the accident." Neb. Rev. Stat. Ann. § 48-126 (Reissue 2010). The definition of wages under the NWHA similarly states, "[w]ages shall mean all remuneration for personal services, including commissions and bonuses and the cash value of all remunerations in any medium other than cash." Neb. Rev. Stat. § 48-1202(5). For purposes of the Court's analysis, the Nebraska Court of Appeal's interpretation of workers compensation law is persuasive in interpreting wages under the NWHA.

driver, upon which the company does not pay FICA or taxes and which the driver does not report as income." *Id.* at 818–19. However, the court concluded that the payment was a wage to the truck driver because he did not have to provide receipts or otherwise prove he actually incurred $44 per day to receive the payment. *Id.* at 820. The Nebraska Court of Appeals concluded "the evidence does not show a dollar-for-dollar reimbursement for meals and lodging or anything close to it. It simply shows an accounting entry to take advantage of an apparent tax benefit available to trucking companies and their drivers." *Id.* As a result, the Nebraska Court of Appeals concluded the $44 daily per diem was not a genuine "reimbursement" and instead represented actual financial gain to the driver. *Id.*

Based on the similar facts in this case, the Court concludes that the Payments to participating drivers were "wages" under the NWHA and not reimbursements. Because Plaintiffs' claims under the NWPCA are based on their claims under the NWHA, to the extent such claims are legally permissible, they must likewise be dismissed. Also, Plaintiffs' remaining claims, for unjust enrichment and breach of implied contract, likewise fail because Plaintiffs have not shown that Werner failed to pay Plaintiffs a minimum wage under either the FLSA or the NWHA.

## CONCLUSION

For the reasons stated above, the undisputed evidence shows that the Payments at the center of this case act as wages rather than as true reimbursements. Further, the evidence does not demonstrate that the Payments reimbursed the Plaintiffs for expenses they actually incurred. Accordingly, Plaintiffs' claims under the FLSA and state law fail as a matter of law and must be dismissed.

IT IS ORDERED:

1.    The Motion for Summary Judgment, ECF No. 316, filed by Defendants

       Werner Enterprises, Inc., and Drivers Management, LLC, is granted;

2.    Plaintiffs' Motion for Summary Judgment, ECF No. 321, is denied;

3.    This matter is dismissed, with prejudice;

4.    All other pending motions are denied as moot; and

5.    A separate judgment will be entered.

Dated this 23rd day of March, 2017.


                                        BY THE COURT:

                                        s/Laurie Smith Camp
                                        Chief United States District Judge